(36 South. 208.)

No. 14,926.

TOWN OF MORGAN CITY v. DALTON
(MARTIN, Intervener).

(Feb. 29, 1904.)

ACTION ON CONTRACT — PLEADING — GENERAL DENIAL—SUIT BY MUNICIPALITY—LEASE —ESTOPPEL TO DENY TITLE.

1. A general denial does not conflict with the special defense that the contract sued on was ultra vires of the plaintiff and contrary to public policy.

2. Where suit is brought by a municipal corporation to recover money alleged to be due under a contract which has been practically executed upon its part, a citizen and taxpayer has no interest to defeat such recovery upon the ground that the contract was unauthorized.

3. As between lessor and lessee, the law recognizes the validity of a lease by one person of the property of another, and it is well settled that he who enters upon and enjoys the possession of property as lessee cannot, by way of defense to an action to enforce the obligations of his lease, contest the title of his lessor, even though he himself may have acquired an adverse and better title.

4. As the owner, who voluntarily becomes the lessee of one who has no title to the property leased, is estopped to deny, for the purposes of the lease, that the lessor is the owner, it follows, a fortiori, that a lessee, who cannot pretend to be the owner, is estopped, after enjoying possession, and merely to escape liability for the consideration therefor, to question the title of the lessor from whom such possession was received.

5. Where a member of a municipal council actively participates in authorizing contracts involving the use by individuals of property under the control of the corporation, and is himself the principal beneficiary, he is hardly in a position to urge, as a defense to a suit brought to recover the consideration of a contract of that character, the benefit of which he has enjoyed and exhausted, that it was against good morals and public policy.

On Rehearing.

6. The power of a municipality to make temporary leases of portions of wharves in the interest of commerce has been recognized by our jurisprudence and statutes. Leonard's Heirs v. Baton Rouge, 4 South. 241, 39 La. Ann. 275; section 15, p. 223, Act No. 135 of 1898. When the lessee has enjoyed the benefit of such leases, he has no standing to plead that the premises were locus publicus, and that the contracts were ultra vires.

(Syllabus by the Court.)

Appeal from Twenty-Third Judicial District Court, Parish of St. Mary; Albert Campbell Allen, Judge.

Action by the town of Morgan City against John Dalton. Thomas Martin intervened. Judgment for plaintiff. and intervener and defendant appeal. Modified.

Philip H. Mentz and Donelson Caffery & Son, for appellant. Percy Saint, for appellant intervener. Foster, Milling, Godchaux & Sanders, for appellee.

Statement.

MONROE, J. Petitioner alleges that upon June 30, 1890, it entered into a contract with the defendant (which, upon November 29, 1894, was renewed for 10 years), whereby it granted him the use of certain property upon its water front for the purposes of the fish and oyster business, and whereby, in consideration of such grant, he agreed to deliver to petitioner the shells of the oysters to be opened by him, and to apply those not so required to the improvement of the water front, and further agreed that the buildings and improvements to be erected by him on the property should revert to petitioner at the expiration of the grant; that W. B. Gray became the lessee, at $5 a month, under a contract running for 10 years from November 29, 1894, of certain property similarly situated, and that the defendant was or became the transferee of Gray, and assumed his obligations; that for a number of years defendant complied with his contract in the matter of the delivery of shells, but that during the seasons of 1898–1899 and 1899–1900 he refused such compliance, and sold his shells, to the value of $2,175, to other persons; and that during the

season of 1900–1901 he failed to open oysters upon the property in question, and erected a shed and carried on business upon other property, and that petitioners thereby lost shells to the value of $2,175. It further alleges that defendant erected a building, which, under his contract, should have reverted to petitioner, but that in August, 1900, it was burned, and that defendant collected and retained $1,600, for which it was insured; and that he has removed and otherwise disposed of other improvements, which should have reverted to petitioner, as follows, viz.: 1 water tank, worth $90; 1 shed, worth $200; 200 feet of gutters, worth $50; 50 feet of pipe, worth $12; and one steam plant (on the property held under Gray's contract), worth $750. It further alleges that the building constructed by the defendant encroached upon the street, and that he agreed to pay $2.50 per month until its removal; that his grant has been forfeited, and that he has voluntarily surrendered the same; and it prays for citation, and for judgment for $400, due by defendant, prior to March 1, 1900, as the transferee of Gray, together with $5 a month, thereafter, for $1,087.50 as the value of shells sold by defendant in 1898–1899, for $1,087.50 for shells sold in 1899–1900, for $2,175 for shells which would have been due to petitioner if oysters had been opened upon the grants of the said Dalton as per his contract, in 1900–1901, for $1,600 as the value of the buildings destroyed by fire, for $352.50 and $750 as the value of property removed, and for $240 due under his agreement with regard to the encroachment of his building on the street—all with interest from various dates.

The defendant filed exceptions of "no cause of action" and prescription, which were referred to the merits, and answered, denying the allegations of the petition, save as admitted. He admits that he surrendered the property which he is alleged to have rented, and avers that the same is public property,

hors du commerce, and that it could not be devoted to private uses for a consideration or otherwise.

Thomas Martin intervened, alleging that he is a resident and taxpayer of Morgan City; that the property referred to in the petition is public; that the contracts sued on are void; and praying that it be so decreed. A motion to strike out this intervention having been overruled, the plaintiff answered that the intervener is an employé of the defendant, and is without interest.

The judge a quo reached the conclusion that the intervener is without interest, and dismissed him from the case, and he gave judgment for the plaintiff against the defendant with respect to a number of the items specified in the petition. The defendant and the intervener have appealed, and the plaintiff answers the appeal, praying for an amendment of the judgment. The plaintiff also moves to dismiss the appeal taken by the intervener.

It appears from the evidence that upon October 14, 1889, the mayor and council of Morgan City adopted two ordinances, reading, so far as they need be quoted, as follows:

"Section 1. * * * That it shall hereafter be lawful for any person who desires to engage in the fishing or oyster business to build and erect oyster sheds and houses and fishing depots on the river bank, within the corporate limits of the city, said buildings and sheds to be at least ten feet from the bank [bulk?] head of the river and to be put up conformably to the sanitary rules and regulations of the city and under the supervision of the committee on streets and sidewalks. Sec. 2. * * * That, in consideration of the privilege granted in section 1 of this ordinance, all persons engaging, or who shall hereafter engage, in the oyster trade shall donate to the city, free of charge, all their oyster shells, and all shells not used by the city shall be used by the oyster dealers in fill-

ing up the bulk heads between their oyster houses and the river's edge."

"Section 1. * * * That in order to promote the growth of, and encourage and extend, the fish and oyster business within the corporate limits of Morgan City and secure its permanency in our midst, John Dalton is hereby granted the use of the river front of the property occupied by him as a store and that belonging to Darrall and Miller, on Front street in Morgan City, with the privilege to construct piers and wharves and fish and oyster houses necessary to conduct his business and to occupy the same during the existence of this grant. Sec. 2. * * * That this grant is made for the term and period of ten years, and all wharves, buildings and improvements, erected and built by the grantee, Dalton, shall be strongly and substantially built, free of cost to the city, and shall become the property of the city at the expiration of this grant. Sec. 3. * * * That the mayor be, and he is, hereby, fully authorized to enter into any contract which may be necessary to carry out more fully the provisions of this ordinance."

The contract thus authorized was entered into January 30, 1890, and, whilst the ordinance first quoted is not mentioned therein, it was well understood that it was accepted as forming part, and that the obligation to furnish shells contained in that ordinance was assumed as one of the considerations, of the contract so entered into. In March, 1891, the defendant became a member of the council of Morgan City (a position which, it may here be remarked, he continued to hold until January 25, 1899), and in August, 1892, he participated in a meeting of that body at which he stated that the oyster house which he had built encroached some five feet on the street, but that he would move it as soon as he could arrange the foundation, and that in the meanwhile he was willing to pay for the use of the street; whereupon it was re-

solved that he be permitted to use the five feet of the street during "the present oyster season," and that he pay the city $2.50 a month for the same—a proposition which was at once accepted. The house, however, remained where it was until burned down, two years afterwards, and the defendant paid nothing. In October, 1893, W. B. Gray leased 50 feet of the water front for one year with the privilege of two, and he seems to have obtained control of additional property as the transferee of leases which had been made to E. A. Wood and to the Berwick Bay Packing Company, and in September, 1894, he leased to the defendant the packing company property which adjoins that of which the defendant had already obtained control. Upon November 22, 1894, the council, "after considerable discussion," instructed the mayor to renew the grants which had been made to W. B. Gray and John Dalton, and upon November 29, 1894, contracts were entered into whereby those grants were extended for 10 years from that date; the grant to Gray, thus renewed and extended, including the Wood and packing company fronts, as well as the front which had originally been granted to him, and being made upon the conditions that he should make the entire front solid by filling in with oyster shells, pay the city $5 a month after the first year, and that all buildings and improvements placed upon the property should revert to the city at the expiration of the grant. Upon June 10, 1895, a resolution was adopted by the council ordering that Messrs. Spangler and John Dalton be notified to pay no more rent to W. B. Gray under the leases held by them, and that the same be collected by the city collector. It does not appear that the defendant, who was present and participated in the proceedings, objected to or made any comment on this action, but at another meeting, held August 17, 1896, he reported "that with the

approval of the mayor he had paid the lease of the St. Clair wharf to June 10, 1895, to W. B. Gray, and requested that the mayor enter into a lease with him for the said wharf for the balance of the * * * municipal year, and the payment was approved, and the mayor requested to enter into the lease as stated."

In 1898, the people of Morgan City appear to have elected a new set of officers, who assumed their functions on the 25th of January, 1899, and very soon afterwards the mayor and the chairman and one member of the committee on streets and sidewalks called upon the defendant, and demanded a compliance with his obligation to deliver his shells to the city. They were, however, informed that he had made a contract to deliver them to other parties, the fulfillment of which would require about all the shells that his business would yield during that season, but that, if they would wait, he would deliver the yield of the next season to the city; and they waited. The oyster season begins in September and ends in May. During the early part of the season of 1899–1900, and in fact until about April 1, 1900, the defendant delivered his shells according to his contract with the city and to his promise made to its officials, but in March, 1900, he found that he needed them for his own purposes, became offended because the city objected to his keeping them, and refused to make any more deliveries, save upon his own terms. In the meanwhile—that is to say, in November, 1899—he had obtained from the mayor and council a lease for 10 years of an additional 200 feet of water front lying between certain property owned by himself and the bay. In the spring or summer of 1900 he built a packing house upon the newly leased front, and, informing the city that he "surrendered" his original grant, moved his business there, carrying with him or otherwise disposing of certain property

referred to in the petition as "improvements" which should have reverted to the city. As to this we find, with the judge a quo, that the shed with the corrugated iron roof was worth $150, the galvanized iron gutters $50, the water tank $50, and the iron piping $6.20, and that the other property was not within the terms of the contract. The main house upon the abandoned site was burned August 30, 1900, and the defendant collected $889.68 as the amount at which the loss was adjusted under a policy of insurance for $1,000. The city has no just claim to the amount so collected. It is proper to remark in this connection that the house originally constructed was burned in 1894, and that it does not appear that the building by which it was replaced (and which was also destroyed by fire in 1896) encroached upon the street. The defendant, who has testified at considerable length, insists that he has been at all times, and is now, ready to deliver shells according to his contract, and that, if he has not done so, it has been because the city has been unable to take them, and that he has otherwise disposed of them only to get them out of his way and avoid obstructing the street and railway, which are near by. No such reasons were assigned when the shells were demanded by the city officials in 1899, and again in 1900. On the contrary, the defendant then said in the one case that he had sold the output of his establishment, and in the other that he needed the shells for his own use; and the evidence satisfies us that the city could have taken the shells, and, if they had not been taken, that the defendant could have used them, in accordance with the terms of his contract, by filling and improving the water front. An effort has been made to show that some shells have been on hand awaiting the plaintiff's pleasure, and it is shown that the defendant offered to deliver others on cars at $2.75 per car load. The facts

as they appear to us are that the city had constructed a platform upon which the defendant was accustomed to deliver shells intended for its use, but, although the platform is not shown to have been overloaded at any time, and it would have cost him no more to have delivered them there, that the defendant thought proper to deliver a lot of shells ·(the quantity being left at large) on the ground between his packing house and the water's edge, where they are inconvenient of access and hard to handle, and where, though he himself has since sold and delivered a great many shells, they remain to this day. As to the other matter, it appears that the mayor, having called on the defendant to deliver shells, stated by way of inducement or persuasion that the city had made sales, and needed them to fill its contracts, whereupon the defendant offered to furnish shells, provided he was given the job of loading them on the cars at $2.75 a car load. It may be that neither the statement nor the offer were seriously made, but, in any event, the defendant had no right to impose the condition, and his offer was dehors his contract. Our conclusion upon this subject is that the defendant's failure to deliver shells as he had agreed is more satisfactorily accounted for by the fact that he found a ready market for them at a handsome profit, than by any explanation that he offers. It is shown that shells weigh about 200 pounds to the barrel, that about 200 barrels make a car load, that they could readily be sold for $10 f. o. b. cars at Morgan City, and that it costs $2.75 a car to load them. The defendant testifies that it takes 12 barrels of sound shells to make a ton of crushed shells, and no one contradicts his testimony. Bearing these facts in mind, the following statement, mainly from the defendant's books, shows with reasonable certainty the quantity of shells sold by him, but which should have been delivered under his contract with the city, between September, 1898, and April, 1902, together with the amounts realized, to wit:

| | | | | |
|---|---|---|---|---|
| 1898 Sept. 28 | To Zenor | 2,000 bbls. · | 10 cars | $ 160 00 |
| 1899 Feb. 24 | " Pharr | 2,608 | 13 | 130 40 |
| 1899 Mrch. 22 | " " | 2,689 | 13 | 134 45 |
| 1899 Feb. to April. | " Moresi | 13,200 | 66 | 660 00 |
| 1900 April. | " Clarke | 2,200 | 11 | 110 00 |
| 1900 Sept. | " Thompson | 1,225 | 6 | 98 00 |
| 1901 Feb. to May | " Town of Franklin | 1,710 | 108 | 1,085 51 |
| 1901 Sept. to Dec. | " Town of Jeanerette | 11,000 | 54 | 456 00 |
| 1901-2 Dec. to April. | " So. Pac. Co. | 21,840 (crushed) | 109 | 1,820 00 |
| | | | | $4,694 36 |

The judge a quo has allowed the defendant the supposed cost of crushing the shells sold the Southern Pacific Company by charging him only with the value of the sound shells crushed as fixed by the defendant himself, to wit, 5 cents per barrel, thereby reducing the item of $1,820 to $1,092, which seems to us to be a fair method. He has, however, no doubt by inadvertence, charged $62, instead of $98, for shells furnished Thompson, and has failed to charge the shells furnished during the season of 1898–1899 to Zenor, Pharr, and Moresi, which, we think, was error, the acquiescence of the city officials in

the defendant's refusal to deliver the yield of that season affording no sufficient reason for imposing the loss on the city. In the matter of the claim for the rent of the property leased by the defendant from Gray the evidence satisfies us that Gray is no longer concerned, and that the defendant has occupied the property rent free as far back as June 10, 1895.

### Opinion.

It appears from the transcript that the intervener was allowed an appeal, returnable June 26, 1903; that he filed a bond, and that the appeal was lodged here June 22, 1903. We therefore find no reason for dismissing it. We are unable, however, to discover in what way, as a citizen and a taxpayer of Morgan City, the intervener is interested in defeating the attempt of the city to recover the money here claimed, and we conclude that he was properly dismissed from the suit.

The general denial of the defendant is not in conflict with his special defense, since the latter in no manner admits that there ever existed such a contract as that sued on. The evidence offered on behalf of the defendant for the purpose of showing compliance was probably inadmissible, but it was not objected to, and the defendant, as a witness, does not deny the contract; so that the case stands as though he had merely set up want of authority in the plaintiff to make such a contract, and had alleged that, in any event, he had complied with its conditions. The objection is, however, well made that the defendant cannot be heard upon the first of these defenses, and the second is not sustained by the evidence.

Our law recognizes, at all events for the purposes of the present question, the validity of the lease by one person of the property of another, and it is well settled that he who enters upon and enjoys the possession of property as a lessee cannot, by way of defense to an action to enforce the obligations of his lease, contest the title of his lessor, even though he himself may acquire an adverse and better title. Rev. Civ. Code, art. 2682; Dennistoun v. Walton, 8 Rob. 211; Tippett v. Jett, 10 La. 259; Hanson v. Allen, 37 La. Ann. 733. "The principal obligation of the lessor," said the court in the case first above cited, "is to maintain the lessee in quiet enjoyment of the thing, and while he is undisturbed he cannot gainsay the title of his lessor. The object of the contract is the use of the thing." If, then, the owner, having voluntarily become the lessee of one who has no title to the property leased, is estopped to deny, for the purposes of the lease, that his lessor is the owner, it must follow that the defendant in this case, who sets up no title to the property, for the consideration of a past possession of which he is sued, is estopped to question the title or authority of the plaintiff from whom he received that possession, unless, indeed, it could be shown that he has a better standing in court for the assertion of the rights of the public and of other individuals than for the vindication of his own rights.

We find nothing favorable to the defendant's case in the considerations of morality and public policy which have been suggested. On the contrary, it would have been better for him to have remained silent upon that subject, for if there was any abuse of authority on the part of the council of Morgan City in the matter of granting the use of the water front to the oystermen, the defendant, as a member of that council, not only participated in it, but was the principal beneficiary, and is still holding 250 feet of the front under contracts similar to that which, having exhausted its benefits, he is now denouncing as illegal and immoral. It is true that he

assures the court, through his counsel, that, having been advised of the error of his ways, "he will vacate the premises now occupied by him as soon as he can make the proper arrangements to conduct his business elsewhere," from which, and from the facts developed by the testimony, it would appear that he regards morality and a proper regard for public policy as considerations which are imperative on the council, of which he is no longer a member, but which may be postponed as his personal convenience or interest may require.

As to the facts, we have but little to add to the statement which precedes this opinion. The probability is that the output of shells from the defendant's establishment between September, 1898, and May, 1902, was not less than 600 car loads, or say 120,000 barrels, of which the plaintiff received during part of the season of 1899–1900 perhaps 25,000 barrels, leaving 95,000 barrels to be accounted for. Some of these may have been used in filling the bank. We know that some were used by the defendant for his own purposes, and that some are lying behind his packing house. Those for which he is charged, being less than 60,000 barrels, are shown by his own books and testimony to have been actually sold and delivered by him, in violation of his contract with the plaintiff, to the persons whose names are mentioned, and in holding him to account for the amounts received we place him in no worse position than that in which he is placed by his contract.

The judge a quo maintained the plea of prescription as against the claim for $2.50 per month for the use of the street and as against that portion of the claim for the rental of the Gray property that was more than three years old, and rendered judgment for the plaintiff for the following amounts, with interest at 5 per cent. from various dates, to wit:

| | |
|---|---:|
| For shells sold to Thompson.................... $ | 62 00 |
| For shells sold to Clarke...................... | 110 00 |
| For shells sold to Town of Franklin......... | 1,085 51 |
| For shells sold to Town of Jeanerette........ | 486 00 |
| For shells sold to Southern Pacific Company | 1,092 00 |
| For shed gutters, tank, and piping removed | 256 00 |
| For rent Gray property from 3/12/98 to date of judgment ............................... | 305 00 |

He also dismissed the intervention as in case of nonsuit. We are of opinion that to this there should be added the amounts received by the defendant from shells sold to Pharr and Moresi subsequently to March 12, 1899, those previously sold to Zenor and Pharr falling within the prescription of three years.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be amended by condemning the defendant to pay to the plaintiff the further sum of $794.45, with interest thereon at the rate of 5 per cent. per annum from June 1, 1899, until paid, and, as amended, that said judgment be affirmed; the appellants to pay all costs.

### On Rehearing.

#### (March 28, 1904.)

LAND, J. Defendant renews his contention that the lease in question was illegal, and urges that the court erred in holding him, as lessee, estopped to set up such illegality. We are not prepared to admit that the lease was for an illegal purpose, or that the town, in making the contract, exceeded its powers in the premises. We held that defendant having, as lessee, enjoyed the use of the wharf, could not, when sued for the rent, plead that the place was locus publicus, and therefore his lessor had no power to make the contract. The public had not complained, and the lessee had not been disturbed in his enjoyment of the privilege acquired under the contract of lease. He had no right to occupy and use public property free of charge.

The charter of the city vested the mayor and council with the entire control of the

banks of Bayou Boeuf and Berwick's Bay, with the power to impose and collect levee fees or wharfage. Acts 1876, p. 23, No. 7.

In the instant case the leases were made "to promote the growth of, and encourage and extend, the fish and oyster business within the corporate limits of Morgan City," and for that purpose the city granted the privilege of constructing piers and wharves and fish and oyster houses necessary to conduct the business. This privilege was offered to all persons who might desire to engage in such business on the condition that all oyster shells should be donated to the city for the purpose of constructing and extending bulkheads and improving roadways.

The city, under its powers of control and administration, might have constructed the piers and wharves and charged fees for their use. Under the contract all improvements of that nature, as well as the buildings, were to revert to the city at the expiration of the leases.

In the case of Leonard's Heirs v. Baton Rouge, 39 La. Ann. 275, 4 South. 241, the court held that the use of property as a landing and wharf for the reception of coal boats and coal is a public use, the public character of which is not destroyed by the fact that it is temporarily farmed out to particular parties.

This power of temporary lease in the interest of commerce is recognized in our jurisprudence, and was by the general corporation act of 1898 conferred on all municipalities to be thereafter created.

Therefore the purpose of the lease to defendant was not illegal or immoral, and, if he be not estopped as lessee to contest the authority of the city to make the lease, we are not prepared to hold that the contracts were ultra vires.

We do not think that there is any force in the other points, involving questions of fact, made in the application.

Rehearing refused.