(91 South. 765)

No. 22385.

**NABORS OIL & GAS CO. v. LOUISIANA OIL REFINING CO. et al.**

(April 11, 1921. On Rehearing, Feb. 27, 1922. Second Rehearing Refused May 1, 1922.)

*(Syllabus by Monroe, C. J., on Original Hearing, Reversed on Rehearing.)*

**1. Denial of lessor's title by lessee.**

An ordinary oil and gas lease, though containing elements of a sale, is sufficiently a lease to bring it within the rule that the lessee, enjoying undisturbed possession, acquired under such contract, cannot deny or contest the title or right of possession of his lessor; or avail himself of an alleged lease entered into with another person, claiming title to the property. His possession is that of his lessor, and he cannot change its character or his quality with respect thereto.

**2. Exclusion of prescription by contract.**

A contract, not prohibited by law, nor in contravention of public policy or good morals, is the law governing the agreement between the parties thereto; and where, in oil and gas leases, the owner of the land, in agreement with the other party grants, or reserves to himself, his heirs and assigns, all the minerals underlying the soil, with the right of ingress and egress "at all times," or "at any time hereafter," for the purpose of reducing to possession and removing such minerals, the grant or reservation is effective, as to all minerals, whether solid or fugacious, and is not controlled by the prescription of ten years established by Civ. Code, art. 789, against the exercise of a right of servitude in the event of nonuser during that period.

**3. Interruption of prescription.**

Though it should be conceded (arguendo, merely) that an instrument purporting to evidence a sale of all minerals underlying certain land, and a grant of rights of ingress, egress, mining, etc., "at all times," for the purpose of reducing such minerals to possession, confers upon the grantee merely a right of servitude, with respect to volatile or fugacious minerals, such as gas or oil, which servitude is prescriptible, for nonuser, during 10 years, yet the power exercised to grant the servitude may be again exercised to extend to it by interrupting the prescription; and where, a year or more after the execution of such instrument, the owner sells the land by another instrument, wherein he saves, excepts, and reserves, to himself, his heirs and assigns, all the minerals that may lie therein or thereunder, with right of ingress, egress, etc., "at any time hereafter," such reservation operates as an interruption quoad the vendee of the land, who is a party to it, of any prescription, the required period of which could have had its beginning at the execution of the first instrument; and upon no conceivable theory could it be held that the vendee of the land acquired the mineral rights within ten years from the execution of the first instrument by reason of the failure of the grantee therein—assign of the owner of the land—to exercise his rights within that period.

**4. Who are possessors in bad faith.**

One becomes a possessor in bad faith from the moment that the defect in his title is made known to him, or is declared in a suit brought by the owner to recover the property. If, whether acting upon his own judgment or the advice of others, he refuses, when so informed or sued, to surrender the property, and it is wrested from him by judicial decree, his status as a possessor in bad faith is established and he becomes liable accordingly.

**5. Rights and liability of possessors in bad faith.**

The possessor in bad faith is liable to the owner for the revenues of the property during his possession. He is entitled to recover money expended for the preservation of the property; and, if the owner elects to keep improvements made by him, to recover the cost of the material and labor expended in that behalf. An exception to that rule is recognized with respect to works inseparable from the soil, such as ditches and wells; and an exception to that exception may be recognized where the improvement is a well producing oil or gas in paying quantities, his claim for the cost of which may be used as a set-off, pro tanto, to that of the owner for revenues.

**6. Liability of warrantor.**

A warrantor is liable for the restitution of the price, but, where the eviction is not complete and the value of that portion of the property which the warrantee retains is not disclosed, a court has no means of determining the amount of the liability.

O'Niell, J., dissenting in part.

## On Rehearing.

*(Syllabus by Editorial Staff.)*

**7. Mines and minerals ☞55(7)—Rights under conveyance of oil and gas lost by prescription when not exercised for ten years.**

As a sale of oil and gas does not convey the ownership of the oil or gas itself as physical or corporeal property, but only a real right or servitude to explore therefor, and reduce it to possession, the rights acquired by such a conveyance were lost by prescription where no attempt was made to exercise the rights for ten years.

**8. Mines and minerals ☞55(7)—Reservation of mineral rights by one who had conveyed minerals held not to interrupt prescription against grantee's rights.**

Where an owner of land sold and conveyed the oil, gas, and other minerals, and thereafter conveyed the land reserving to himself, his heirs and assigns, all oil, gas, and other minerals, the reservation did not inure to the benefit of the grantee of the mineral rights or interrupt the prescription liberandi causa against such grantee's rights.

**9. Mines and minerals ☞55(7)—Grant of mineral rights to be exercised at all times or at any time does not make the rights imprescriptible.**

Under Civ. Code, arts. 3459, 3460, 3549, 3556, a seller of mineral rights could not bind himself or subsequent owners by an agreement that the real obligation or servitude thereby imposed on the land should not be subject to the prescription liberandi causa, and a conveyance of mineral rights, to be exercised "at all times" or "at any time," did not make such rights imprescriptible.

**10. Mines and minerals ☞60—Doctrine of estoppel held not to preclude lessee taking lease from others after learning of loss of rights by lessor.**

The doctrine that an ordinary lessee cannot dispute the title of his lessor during the time of the lease has no application to a contract in the form of an oil and gas lease by which a person acquires mineral rights, it being more like a sale than an ordinary lease, and the lessee, on learning that the lessor had lost its rights by prescription before the original lease was acquired, was not precluded from acquiring a lease from the owners of the land.

Provosty, C. J., and Land and Baker, JJ., dissenting.

Appeal from Twelfth Judicial District Court, Parish of De Soto; John H. Boone, Judge.

Suit by the Nabors Oil & Gas Company against the Louisiana Oil Refining Company and others. From a judgment in favor of plaintiff, defendants appeal. Judgment annulled, plaintiff's demands rejected, and suit dismissed on rehearing.

Liverman & Pollock, of Mansfield, for appellant Nabors Oil & Gas Co.

Blanchard, Goldstein & Walker, of Shreveport, for appellant Louisiana Oil Refining Co.

Wilkinson, Lewis & Wilkinson, of Shreveport, for appellee Southwestern Gas & Electric Co.

By the WHOLE COURT.

### Statement of the Case.

MONROE, C. J. Plaintiff (sometimes herein called Nabors Company) sues to annul a certain oil and gas lease, entered into by it and the defendant named in the title (hereafter called oil company) and assigned by the latter to the Southwestern Gas & Electric Company (hereafter called gas company), made codefendant. The matter comes before this court on appeals taken by plaintiff and the oil company, and an answer by the gas company. The litigation has arisen out of the following contracts, acts, and facts, to wit:

"On February 15, 1904, S. G. Sample" sold "to the Louisiana Coal & Lumber Company (hereafter called coal company) all the oil and gas and coal and other minerals, in and under the following described lands, situated in De Soto parish, together with the rights of ingress and egress, at all times, for the purpose of drilling, mining, and operating for minerals and to conduct all operations and to lay all pipes necessary for the production, mining and transportation of the oil, gas, water, coal and other minerals, with the right to use sufficient water, gas or oil to operate said property, etc."

Then follow descriptions of various subdivisions of land, aggregating 1,260 acres, including the E. ½ of S. W.¼ of section 9, township 12 N., range 12 W., containing 80 acres, the minerals beneath which, alone, are involved in this suit.

On April 15, 1905, the same vendor sold to Hill Moseley the 80 acres thus mentioned, "saving and excepting and reserving unto the said vendor, his heirs and assigns, all oil, gas and other valuable minerals that may be under the surface of said land with the right to mine them, or otherwise bring them to the surface of said land and remove or market them therefrom, at any time hereafter."

On January 22, 1911, the coal company, acting through S. G. Sample and H. T. Liverman, its liquidating commissioners, sold the minerals so acquired by it to J. M. Nabors, by whom on August 11, 1911, they were sold to the Nabors Oil & Gas Company, plaintiff herein; which company, on May 6, 1911, entered into the contract here sought to be annulled, and which contains, with others, the following stipulations and provisions, to wit:

"That said lessor does hereby lease unto said lessee all the gas and other minerals in and under the * * * E. ½ of S. W. ¼ of sec. 9, T. 12 N., R. 12 W., containing 80 acres, more or less, and lying * * * in De Soto parish. * * * The said lease * * * of said mineral rights in and under said land is hereby made for the sole and only purpose of drilling and boring for oil and gas thereon and for producing and extracting oil and gas therefrom, with the exclusive right to said lessee of drilling and operating thereon in order to produce oil and gas therefrom, under the terms, obligations, stipulations and conditions as herein set forth, with the right to use and occupy such rights of way, over and across said lands as may be necessary for the purpose of conveying water, oil and gas from said lands as may be necessary to drill wells thereon for such purposes, and to operate such wells as said lessee may bore or drill thereon, and with such rights of occupancy of, and ingress and egress to, and from, said lands, and with such other rights and privileges as may be reasonably requisite and necessary for the conducting of the operations of boring and drilling and exploring said lands for the production of oil and gas therefrom, as hereinafter provided. * * *

"The main and primary object of this lease is for the exploration and development of said lands for oil and the exploration and development thereof and for the boring and drilling of a well or wells thereon for the production of oil therefrom, and, secondarily and incidentally, for the production of gas therefrom as aforesaid.

"Said lessee agrees and obligates himself to begin the boring and drilling of the first well under this lease on said lands not later than June 1st, 1914, and prosecute and continue the said work, with due and uninterrupted diligence, until the same shall be completed, as a successful well, producing oil or gas, in paying quantities, or abandoned, as an unsuccessful well after a bona fide effort to complete it as a successful well.

"After the said first well shall be completed, or abandoned, as aforesaid, then, the said lessee shall have the right, if he so desires, to bore and drill and complete as many more wells, for oil and gas, on said lands, as he may deem proper; provided, that, the boring and drilling of each succeeding well shall be commenced not later than 30 days after the completion or abandonment of the next preceding well, and the work thereof prosecuted and continued with uninterrupted diligence until the same shall be completed or abandoned."

It is stipulated that, in the event of the production of oil in paying quantities, the lessee shall deliver one-eighth thereof to the lessor, without expense to the lessor; and in the event of the production of gas, in paying quantities, shall pay to the lessor, as royalty, or rental, or price therefor, at the rate of $200 per annum for each gas well, payable at the end of each year from the date of the completion of each gas well; that—

"Each successful gas or oil well * * * shall hold five acres of said lands, adjacent thereto, or around the same; and if lessee shall bore or drill eight successful wells, * * * then the same shall hold the whole of the 80 acres" (with a proviso in regard to necessary offsets).

That—

"A failure on the part of the lessee to fulfill or comply with the terms, obligations, stipulations, provisions, or conditions of this contract of lease shall, ipso facto, operate a forfeiture of all the rights and privileges of lessee under this contract of lease without any notice, demand, or putting in default; and the lessor shall, in no event, be under any obligation to restore, or reimburse, to the lessee any sums of money paid to, or received by, the lessor for royalties, or rentals, under this lease, or for the price and consideration thereof, or forfeitures thereunder, or otherwise; nor, shall the lessor be under any obligation whatever, in any event, to restore or reimburse to lessee any sums, or charges, or expenses, paid, incurred or expended by lessee in the effort to develop said lands, herein described, for oil and gas under this lease."

It is further stipulated that, whenever the lessee abandons a well or discontinues operations, under the lease, it shall have the right to remove its machinery and pull up and remove its pipings and casings; that, if oil or gas is produced in paying quantities, the life of the lease shall be extended for 25 years, or as long as such production shall continue—

"If the same and all the obligations, stipulations, provisions and conditions thereof shall have been fully carried out, complied with and fulfilled by the lessee. * * *

"Any assign, or assigns, or transferee or transferees, or legal heirs, or legal representatives, of either the lessor or lessee shall assume and have the same rights and obligations under this lease as the original lessor and lessee have thereunder."

By reason of an understanding with plaintiff's president, the lessee took no steps towards drilling a well, "not later than June 1st," as required by its contract, and, though we assume that it has in its possession the "log" of the driller, containing exact information not only as to the date when the drilling was begun, but as to the progress of the work and the development, as it progressed, foot by foot, the date upon which the well was "brought in" as a gas well is left somewhat in obscurity.

The driller was the only witness called by the lessee, and the extent of the information furnished by him is: That he was employed by the oil company to drill the first well on the tract; that he knew the well as Nabors 1," but that the officers of the company called it "Moseley 1"; that he erected the derrick about June 25th or 26th; began drilling on July 3d; did not know, but "imagined," that he reached "shallow gas" by July 23d; that the well came in as a gas well; that he cemented the 6-inch casing September 7th; "shut in" the well before he left (date of leaving not given); went back and opened it and put in a heavier connection; built a "standard rig" and went down 2,600 feet seeking an increase of the oil product; that the well was then closed, and, as he understood, sold. In

a letter from the secretary of the oil company to plaintiff, of date September 9, 1915, the writer states that "the well in section 9—12—12 was finished on November 16, 1916" (meaning, as we understand, as an attempted oil well, 2,600 feet deep), but there are indications in the record that it was completed as a gas well, at an earlier date. However that may be, we find no reason to doubt that gas was found, in paying quantities, prior to July 24, 1914, when the oil company, as it alleges, "acquired" from the widow and heirs of Hill Moseley a lease covering the same property and imposing upon it, if that were possible, less in the way of obligation than the lease from plaintiff.

It is not pretended that the oil company drilled any other well within 30 days after the completion of that to which we have thus referred; and the testimony of plaintiff's president is wholly uncontradicted, to the effect that he made repeated demands that such drilling should be done.

On February 20, 1915, the oil company entered into a contract with the gas company in which it declared that—

It "does by these presents, sell, transfer and deliver, with full and general warranty of title and with complete transfer and subrogation to all rights and actions of warranty against the property herein conveyed, unto the Southwestern Gas & Electric Company * * * the following described property, to wit:

"Those certain oil and gas leases held by it and executed by the widow and heirs of Hill Moseley on the 24th day of July, 1914, as well as any and all other oil and gas leases which it now has of record, or in which it is interested, covering the E. ½ of the S. W. ¼ of section 9; T. 12; R. 12; less the W. ½ of the W. ½ of the E. ½ of the S. W. ¼ of said section, said lease covering 60 acres, more or less, and including the well now located thereon; reserving, however, from this sale, the standard rig and all extra pipe," etc.

The sale purports to have been made for $7,000 cash, and includes an option to purchase, within six months, a certain other lease.

The president of the plaintiff company testifies that, prior to any action by the gas company, under the contract thus granted, he notified its officers that the Nabors company owned the property thereby affected, and warned them to stay off; that, if they went on the tract to drill for oil or gas, he would prosecute them (meaning their company) as trespassers; and there is no attempt to contradict that testimony. The gas company, nevertheless, in 1915, drilled two wells, called Moseley 2, and Moseley 3, respectively, on the tract in question, which produced, and are producing, gas in paying quantities. The auditor of the company (who, with its attorney, were the only witnesses called by it) furnished a statement from which it appears that the total amount of gas produced by the three wells between April 23, 1915, and August 8, 1916, was 501,253,000 cubic feet, of which he estimated that well No. 1 produced one-third.

He testified, in substance, that he was not in a position to say why, in view of the known dispute as to the title, the gas company did not install a meter, so that it would be able to account accurately for the gas produced by the different wells; that, prior to the institution of this suit, it sold the gas to the "Reserve Natural Gas Company" at 2 cents per 1,000 cubic feet; that it installed one meter for the purposes of that business; and, then, as follows:

"Q. You install the meter, and all that, for nothing? A. If we were a company that were producing gas to sell, if we were selling this gas, we wouldn't install the meter; the company we were selling to would install the meter."

From which it would appear that the Reserve Company is, possibly, a name in which the gas company carries on some part of its business, and that the charge for gas furnished it is merely a matter of bookkeeping.

The witness further testifies that, in addition to the cost of boring the wells, the defendant incurred expenses, in connection with

their maintenance in working condition, to the amount of $482.22. He also testifies to the mailing of certain letters advising W. P. McCormick, Nabors Oil & Gas Company, and widow and heirs of Hill Moseley of the deposit in the bank, to the order of either of them, "as they or either of them might be decreed entitled thereto, under conflicting claims to the E. ½ of S. W. ¼ of sec. 9, T. 12 N., R. 12 W.," of various sums of money, aggregating $450, as gas rentals for the first well, from, say, May 21, 1915, to February 20, 1917; and the sum of $400 (deposited January 14, 1916) as rentals for the wells Nos. 2 and 3 for the years ending, respectively, on October 26 and November 14, 1916. There is no evidence connecting W. P. McCormick with the wells in question; and it is shown affirmatively that plaintiff has received none of the money said to have been deposited, or any other in the way of rentals.

The attorney of the gas company testifies that, at the time that company took the assignment from the oil company (February 20, 1915), he advised "that they got a good assignment"; that, later, "the question came up about Nabors claiming it," and he advised them to deposit the money, under the heading of "Moseley lease," to the "credit of Nabors Oil & Gas Company and to the credit of Moseley heirs"; and, later still, being informed "that there had not been any operations whatever by the Nabors Company" under this mineral contract and reservation in the sale by Sample to the coal company, had advised that the Moseley heirs "lease was the only one existing"; that it was his opinion that the sale from Sample to the coal company simply conveyed a servitude, which expired, by nonuser of ten years from the date of the sale from Sample, in 1904, and that the lease from the Nabors Company to the oil company (May 6, 1914) was without force or effect. Such being the facts from which it has arisen, this suit was instituted by the Nabors Company on May 16, 1916,

and the prayer of the plaintiff is that its lease to the oil company be decreed void, for noncompliance, by that company, with its conditions; that it and its assign, the gas company, be condemned, in solido, to pay $600, as rentals for well No. 1, and to render an accounting for and pay the value of the gas produced by the wells 2 and 3, or, in the alternative and in the event that they are not held to be trespassers, pay $800, as rentals for those wells; also, the further sums of $5,000 and $300 per month as long as the present situation continues, as damages.

The gas company pleads the prescription of 10 years, on the ground that the rights asserted by plaintiff are those of servitude and that they expired and were lost by reason of nonuser during that period; and it alleges, for answer, that at the date that well No. 1 was drilled or commenced, the oil company had acquired a mineral lease from the Moseleys, and that the operations were begun under that lease or promise of lease, and not under the lease from plaintiff; that it acquired the lease from the oil company with warranty, and that said company is bound to maintain it in peaceable possession; it admits drilling the wells 2 and 3; but denies that plaintiff is entitled to an accounting for the gas produced therefrom; denies various other allegations of plaintiff's petition; and prays that the oil company be cited in warranty, and, in the event of appearer's eviction, be condemned to reimburse the $7,000 paid to it, and pay such expenses as appearer may have incurred, or may incur.

The oil company, for answer to plaintiff's demands, pleads the prescription of 10 years, "as an absolute bar to any rights whatever, of the plaintiff in or to said lands, or the minerals thereon." Further answering, it alleges:

"That it was misled, by error of fact, and by error of law, in taking and accepting the so-called mineral lease from this plaintiff; and, within a very short time after taking the lease, it discovered and was convinced that the plain-

tiff had no rights or equities whatever in the lands, and that it acquired, on the 24th day of July, A. D. 1914, an oil and mineral lease from the heirs of Hill Moseley, the bona fide owner of the said lands; * * * that it held and operated said lands for gas and oil, prior to its sale thereof to the gas company, under the aforesaid oil and mineral lease, acquired from the aforesaid heirs of Hill Moseley, and not from the plaintiff, and that it owes the plaintiff nothing with respect thereto. * * * Further answering, in the alternative, and only in case the court should hold that the plaintiff is the owner, or ever was the owner, of the mineral rights in said lands, which is here specially denied; and that said ownership was not lost by nonuser, * * * your defendant would show that the plaintiff, by its representations, agreements, and acquiescence, waived the provision in said so-called lease requiring successive drilling at stated periods; that the drilling on said lands, both by defendant and the gas company, * * * proceeded under the knowledge, sanction, and acquiescence of the plaintiff, and no protest to, or objection, in any manner was ever made by the plaintiff to any one holding said lease rights."

Answering the call in warranty by the gas company, the oil company alleges that the lease assigned to the former was a source of profit to it, and that, in the event judgment is rendered against respondent for the price, it should be credited with the amount received by the gas company in the way of revenue under the lease.

By separate petition, the oil company called the widow and heirs of Moseley in warranty; and they excepted and answered as to the call, but, in a pleading which is directed rather to the original petition, filed by the plaintiff in the case, than to that filed by the oil company, though service of the latter petition appears to have been accepted by them, through their attorneys, and though plaintiff's petition contains no prayer that they be cited and the record fails to show that they were cited to answer thereto. The call in warranty appears to have been ignored in the judgment appealed from, and there is no complaint on that ground in this court.

It is admitted by plaintiff that the completion of the well No. 1 vested in the oil company the right to operate that well, in accordance with the terms of the lease, and the use of the five acres of land immediately adjacent to and around the same, so long as gas is produced in paying quantities.

On July 6, 1916, a writ of judicial sequestration was issued under which the minerals in controversy, together with the three wells, were seized by the sheriff, and, since that time, the wells have, presumably, been operated and their products taken into possession and disposed of by that officer, acting under the orders of the district court. The judgment appealed from annuls the lease from plaintiff to the oil company; decrees plaintiff to be the owner of all the oil and gas and other minerals in and under the 80-acre tract in question; the owner of the wells Nos. 2 and 3, drilled on that tract, and of the gas and proceeds of gas produced therefrom, since the sequestration; and condemns the two defendants, in solido, to pay plaintiff $600 as gas rental from well No. 1; and the oil company to pay to the gas company, on the latter's demand in warranty, the sum of $7,000, in reimbursement of the price paid for the assignment of the lease and of well No. 1, and $5,000, in reimbursement of expenditures in drilling wells 2 and 3. The judgment is silent as to any oil that may have been produced prior to the sequestration; as to the demand in warranty, by the oil company against the Moseleys as to well No. 1; and as to the costs of the litigation.

### Opinion.

I. The conveyances from Sample to the coal company of February 15, 1904; from the coal company to Nabors, of January 22, 1911; and from Nabors to the Nabors Company, of August 14, 1911—purport to be "sales" of all the oil, gas, coal, and other minerals, in and under certain described tracts of land, aggregating 1,260 acres, and

including the 80-acre tract involved in this suit, and, save in the conveyance from the coal company to Nabors, there are included in each of those conveyances, in express terms, the grant of the right to enter and operate upon the land, "at all times," for the purpose of reducing to actual possession the minerals thus sold or purported to be sold. The conveyance from Sample to Moseley, of April 15, 1905, purports to be a sale to Moseley of the 80 tract, "saving and excepting and reserving, unto said vendor, his heirs and assigns," all the oil, gas, coal, and other valuable minerals, with the right to mine them, or otherwise bring them to the surface of said land, and to remove or market them therefrom, "at any time hereafter," as also "the right of ingress and egress for said purpose."

In the contract between the Nabors Company and the oil company, to annul which this suit is brought, the parties have taken rather especial pains to make clear their intention that it should be regarded as a lease; that intention being expressed in the following (few among many) instances to be found in the instrument to wit:

"Be it known that * * * this contract * * * between the Nabors * * * Company, hereinafter called, the lessor, and the * * * Refining Company, hereinafter called the lessee:

"Witnesseth: That the said lessor does hereby lease unto said lessee. * * * The said lease by said lessor to said lessee of said mineral rights * * * is hereby made. * * * The primary object of this lease. * * * If oil should be discovered * * * under this contract of lease, * * * the portion * * * coming to the lessor under the contract of lease: * * * A failure of the lessee to * * * comply with the * * * conditions of this contract of lease," etc., etc.

[1] It is true that the fact that the parties have called their contract one of lease does not, necessarily, make it, in law, that which they have called it; but, construing the obvious intention with the terms agreed

on, we find it to be sufficiently a lease to bring it within certain well-settled principles governing the relation between lessor and lessee.

The oil company, by way of defense, alleges that—

"Within a very short time after taking the lease, it discovered and was convinced that plaintiff had no rights or equities whatever in the lands * * * and that it" (lessee holding under lease from plaintiff) "acquired, on the 24th day of July, 1914, an oil and mineral lease from the heirs of Hill Moseley, the bona fide owners of the said lands."

According to the evidence, which there has been no attempt to contradict, the defendant acquired, entered upon, and was in undisturbed possession of, the property and rights covered by the lease from plaintiff, under and in virtue of that lease, and had, not only begun the drilling of the well No. 1, but, prior to the alleged acquisition of the lease from the Moseleys, had so far progressed with the drilling as to have reached gas and to have ascertained that it had been found in paying quantities, at which point, or soon after, the well was "shut in," with a view, as we infer, of giving the oil company, which is interested in oil, rather than gas, an opportunity to consider whether it would drill deeper, in search of oil, or sell out to a company interested in gas; and it was pending that delay, on July 24th, that it acquired the lease from the Moseleys who were, presumably, living on the place, but are not alleged, or shown, prior to the execution of the lease, to have asserted any rights in conflict with those exercised by the oil company, under the lease from plaintiff, or to have conceived the idea that they had any such rights, and who, apparently, granted the lease to the oil company upon such terms as it, the oil company, thought proper to suggest.

Considering the situation as thus presented, it seems that the defendants, in contest-

ing the rights of the plaintiff as lessor, are attempting to occupy an impossible position, inasmuch as, according to the uniform jurisprudence of this court, the lessee cannot be heard to deny or contest the title of the lessor from whom he acquired and enjoys his possession of the leased premises. Nearly a century ago, a lessee, being sued for rent, set up title in himself, as having been acquired from several part owners of the leased property, and Martin, J., as the organ of this court, said:

"The lease was proved, and the occupation of the leased premises by the defendant, during three years. He cannot contest the plaintiff's title, as he had the undisturbed possession of the premises, under a lease from her. Neither can he avail himself of the alleged purchases, from other claimants or owners; as he entered on the land as plaintiff's tenant, his possession was hers, and he could not change it, as to any part of the premises, by the purchase of adverse titles." Tippet v. Jett, 10 La. 362.

And that doctrine has been consistently affirmed to the present day. Dennistoun v. Walton, 8 Rob. 211; Hanson v. Allen, 37 La. Ann. 733; Town of Morgan City v. Dalton, 112 La. 20, 36 South. 208; Bright v. Bell, 113 La. 1090, 37 South. 976; Campbell v. Hart, 118 La. 881, 43 South. 533.

In an earlier case, it was held (quoting from the fifth syllabus) that—

"'Where a tenant, on being required to surrender his lease, to. evade his landlord, puts another in possession, such an act is directly in fraudem legis, and the possessor is considered as without any right or claim to the possession." Richardson v. Scott, 6 La. 55.

We therefore conclude that defendants have no standing to contest the status of the plaintiff as their lessor.

II. In the event that they complain that the point thus considered has not been urged by plaintiff, we proceed to the consideration of the plea of prescription, upon which they rely, and, in so doing, shall pretermit, as not, necessarily, involved therein, the question whether the rights acquired by plaintiff with respect to the minerals in dispute were only those of servitude upon the land containing the minerals, or were rights granted as incidental and necessary to the enjoyment of property by one to whom the same had been sold; our reason for adopting that course being that it is the contention of defendants that oil and gas are not susceptible of ownership until reduced to actual possession, and cannot be bought and sold while in the ground, and hence that, as to them, the contracts here in question must be interpreted as merely establishing what may be called servitudes of exploration and production, upon and from the land beneath the surface of which they were to be sought —a contention which presents the main issue in certain cases now awaiting reargument, and which we find it unnecessary to pass upon in this case.

[2] Conceding then (arguendo, merely,) that, in the act purporting to be one of sale, to the coal company, and the reservation in the sale to Moseley, Sample did no more, as to oil and gas, than to grant to the coal company, and to reserve to himself, his heirs and assigns, a right of servitude upon the land, meaning a right to enter upon the land and mine, remove, and appropriate those minerals, the fact remains that it was he who, in the exercise of his power as owner of the land, and in agreement with the authors in title, respectively, of plaintiffs and defendants herein, granted the servitude, and it seems quite clear that, in the exercise of the same power, it was competent for him to have fixed the time during which the servitude so granted should continue at five, ten, or any number of years, or, to have made it perpetual, as he saw fit, and as the other contracting parties may have agreed; the only limitation upon the power of the owner of land, in the matter of granting servitudes, being that he shall not

deprive his neighbors of the liberty of enjoying their own, and that the servitudes shall imply nothing contrary to public order; the prescription established by C. C. 789, having no application to cases where the duration of the servitude has been fixed by the owner in agreement with other parties in interest. Thus, we find in the Civil Code the following definite provisions, to wit:

"Art. 729. The right of imposing a servitude permanently on an estate belongs to the owner. * * * "

"Art. 748. A servitude may be established * * * for a certain part of an estate, provided the part be designated.

"Art. 749. He whose estate is incumbered with a servitude, may impose on it other servitudes of any kind, provided they do not affect the rights of him who has acquired the first. * * * "

"Art. 783. Servitudes are extinguished: * * *

"(2) By prescription resulting from nonusage of the servitude during the time required to produce its extinction. * * *

"(6) By the expiration of the time for which the servitude was granted, or by the happening of the dissolving condition attached to the servitude."

In the instant case, the right to enter upon the land and mine and remove the minerals, for which the coal company paid $63,000, and Moseley paid nothing, was not subjected to the limitation of time, with respect to its exercise, that the law establishes in cases where the owner is silent, but the owner, in his contracts with his grantees, agreed and stipulated that the right should be exercised "at all times," and "at any time hereafter." The contracts concerned coal as well as oil and gas, and coal had been found, and mined, on or under the land long prior to February 15, 1904; in fact, had been shipped in carload lots; the coal company had been organized, in part, for its further development, and, so far as we are informed, no one knew, in 1904, or now knows, whether the supply beneath the 1,260 acres of land could be mined and sold within ten years or a century. It was known that the

owner of land could legally dismember his title, and grant the surface rights to one person and the subsurface rights to another, and that the fact that the subsurface rights were vested in one would in no manner interfere, while they were not exercised with the enjoyment of the surface rights by another. Instead, therefore, of fixing a time limit within which the rights granted to the coal company should be exercised, Sample, in agreement with that company, declared, by authentic act, that they should be exercised "at all times" and in the following year, in the act whereby he sold the land to Moseley, "saving and excepting and reserving" to himself, "his heirs and assigns," all the minerals, together with the right to mine and remove them, it was stipulated, in agreement with Moseley, that the right so reserved should be exercised "at any time" thereafter ("hereafter" being the word used in the act).

The defense here set up—that the rights so granted have been extinguished by reason of nonusage during ten years—must therefore be predicated upon one or other of three (assumed) postulates, to wit: (1) That the time allowance in such cases is the prescriptive period, of ten years, established by the Civil Code, which must remain unchanged, notwithstanding the expressed will and contractual obligations and rights of the owner, his heirs and assigns, to the contrary; (2) that the specifically expressed will and contractual obligations of the owner, to the effect that his grantees (in one case) shall "at all times," and himself, his heirs and assigns (in another case), shall "at any time hereafter," have the right to enter, mine, etc., upon and in the land, which, and the minerals underlying which, are the subjects of the contracts, are merely the equivalents in meaning of the general codal provision to the effect that rights of servitude are extinguished by reason of nonusage within ten

years; (3) that the time allowance, or declaration by the owner, in agreement with his grantees, that entry and mining may be made and done "at all times" and "at any time hereafter," is applicable to the right to enter upon the land and mine all solid minerals, assumed to be "in place," such as coal, but is inapplicable to minerals said to be fugacious, such as oil and gas, notwithstanding that the owner and his grantees have, by their agreement, applied that identical declaration to oil, gas, coal, and all other valuable minerals.

We are of opinion that neither of the postulates is well founded, whether in law or reason, and that the prescription invoked has no application to the case, for: (1) The specific provision of the Code, that the right of imposing a servitude, permanently, on an estate, belongs to the owner, and various other provisions, relating to servitudes and to freedom of contract, etc., would become meaningless if the general provision that "a right of servitude is extinguished by the non-usage of the same during ten years" be held to apply to cases in which the time limit has been fixed by the owner as well as to those in which it has not been so fixed. (2) The expressed will and contractual obligations and rights of the owner, to the effect that his grantees (in one case) shall, "at all times," and himself, "his heirs and assigns" (in another case), shall, "at any time hereafter," have the right to enter, mine, etc., or, in other words, use the supposed servitude, are irreconcilable with, and cannot be interpreted to bear the same meaning as, the codal provision which is said to limit the right thus conferred to cases in which it is exercised within ten years. (3) That the owner's contracts with respect to the ownership of the minerals in question and the right to explore for and mine them are neither prohibited by law nor in contravention of public policy or good morals, and

hence are the law of the case, as between the parties thereto and those claiming under them, and that, as they declare that the rights here in question may be exercised at all times, and at any time hereafter, with respect to oil, gas, coal, and all other valuable minerals, it does not lie with the courts to say that they shall be so exercised only with respect to one or more of such minerals, whether solid or fugacious.

[3] III. Proceeding upon the assumption that the prescription relied on would be otherwise applicable to the case, we are of opinion that it has never accrued in favor of the Moseleys or those claiming under them, for this, to wit:

Prior to February 15, 1904, Sample was the sole owner of the land and the minerals, or with respect to oil and gas, of the exclusive right to explore the land for, and produce, those minerals; he, upon that day, dismembered his title and conveyed the minerals, and all rights of exploration for and production thereof, to the coal company; but, if the law of prescription, as here invoked, be read into the contract, he remained the reversioner of those rights; that is to say, if the coal company, or its assigns, failed to exercise the rights within ten years, they reverted to him as the party by whom they had been conveyed, or as the owner of the land to be affected, and it is unnecessary to decide whether he would have reacquired them in the one quality or the other. The prescriptive period began to run then (always assuming the applicability of the prescription), on February 15, 1904, and would end on that (or with the preceding) day in 1914. But on April 15, 1905, Sample sold the land to Moseley, "saving, excepting, and reserving," by special stipulation, to "said vendor, his heirs and assigns," the minerals, together with all rights to explore for, mine, and remove them. Moseley was, up to that time, an entire stranger to both land and miner-

als, and, in acquiring the land, he not only did not acquire the minerals or even the right to explore the land in search of them, but concurred in a specific declaration to that effect.

It is clear that, as between him and Sample, they were competent to determine what part of the dismembered title the one was buying and the other selling; or, if it be considered that their competency in that respect was controlled by the prescription here involved, it is still clear that Sample, as the vendor and warrantor of the coal company, with respect to the minerals and mineral rights, as the reversioner of those rights, and as the then owner of the land, had the right to protect his obligation and his interest by reserving from the sale of the land, to himself, his heirs and assigns, all the minerals, together with the right to reduce them to possession, which in agreement with Moseley he did; and, well within ten years from that time, to wit; on July 3, 1914, the successor in title of his assign (the coal company) drilled a well on the land and found gas. Whether the reservation in the sale to Moseley and the drilling of the well were interruptions which inured to the benefit of the coal company, as the assign of Sample; or whether the one was merely the starting point and the other an interruption of the prescription against Sample—it is unnecessary to inquire, since that is a matter which concerns them and not Moseley or those claiming under him; it being enough, for the purposes of this case, that, upon no conceivable theory, can it be held that any title to the minerals, or any right to explore the land in search of them, has ever devolved upon, or been acquired by, Moseley or his widow and heirs or their assigns.

[4, 5] We conclude, therefore, that the trial judge ruled correctly in holding that the plea of prescription is not well founded and that the Moseleys and those holding, or pretending to hold, under them, are possessors in bad faith.

The only muniment of title that the Moseleys could exhibit was the act of sale of the land, which declares that the underlying minerals and right to mine and remove them were reserved to the vendor of their author, his heirs and assigns. The Moseleys were never, for a moment, in possession as owners, or under title of ownership, of either the minerals or the right to mine for them; and defendants were so informed before they entered upon the land under the pretended lease from the Moseleys, and were warned that they would be prosecuted as trespassers if they made such entry. The Codal provision on that subject reads:

"Art. 503. He is a bona fide possessor who possesses as owner by virtue of an act sufficient in terms to transfer property, the defects of which he was ignorant of. He ceases to be a bona fide possessor from the moment these defects are made known to him, or are declared to him by a suit instituted for the recovery of the thing by the owner."

The law, as thus quoted, presupposes the existence of defects in the title, or the bringing of a suit by the owner; but the responsibility of determining whether the defects exist, and whether it is the owner who brings the suit, is thrown upon the possessor from the moment that he is informed that his title is defective, or that a suit is brought by one asserting ownership; and if, then, acting upon his own judgment, or upon the advice of others, he refuses to surrender the property, and it is wrested from him at end of a lawsuit, his status as a possessor in bad faith becomes established, and, where immovable property is involved, his liability is determined in accordance with the following provisions of the Civil Code, to wit:

"Art. 508. When plantations, constructions and works have been made by a third person, and with such persons' own materials, the own-

er of the soil has a right to keep them or to compel this person to take away or demolish the same. * * * If the owner keeps the works, he owes to the owner of the materials nothing but the reimbursement of their value and of the price of workmanship, without any regard to the greater or less value which the soil may have acquired thereby. Nevertheless, if the plantations, edifices or works have been made by a third person evicted, but not sentenced to make restitution of the fruits, because such person possessed bona fide, the owner shall not have a right to demand the demolition of the works, plantations or edifices, but he shall have his choice either to reimburse the value of the materials and the price of workmanship, or to reimburse a sum equal to the enhanced value of the soil."

"Art. 2314. He to whom property is restored must refund to the person who possessed it, even in bad faith, all he had necessarily expended for the preservation of the property."

"Art. 3453. The rights, which are peculiar to the possessor in good faith, are:

"(1) The right which such possessor has to gather for his benefit the fruits of the thing, until it is claimed by the owner, without being bound to account for them, except from the time of the claim for restitution."

It will be observed that article 508 draws no distinction between possessors in good and bad faith; that article 2314 expressly includes, and article 3452, ex vi termini, excludes, possessors in bad faith. These interpretations are recognized by the uniform jurisprudence of this court; and, as that recognition is succinctly set forth in an opinion handed down in one of the decided cases, together with certain rulings, pertinent to other points here presented, we reproduce the following therefrom:

"As just stated, defendant is a possessor in bad faith and, as such, bound to the restitution of fruits and revenues. * * * Per contra, defendant is undoubtedly entitled to necessary expenses for the preservation of the property, under article 2314, C. C., and to a proper adjustment of his claim for constructions and improvements, under article 508, C. C.

"We find not even plausibility in the contention of plaintiffs' counsel that this article does not refer to possessors in bad faith.

"We are somewhat embarrassed by the anomalous circumstance that defendant has not, in his pleadings, asserted or prayed for judgment on such claims. This would undoubtedly be necessary under the general rules of pleading; but, inasmuch as evidence was received on these points, without objection in the court below, and as justice requires an accounting in such cases, we will not debar the defendant from relief. The evidence, however, is entirely insufficient to enable us to determine his rights under the law.

"As to expenses and repairs, he is only entitled to such as were necessary for the preservation of the property; under the express terms of C. C. 2314. * * * As to improvements, by their nature inseparable from the soil, such as ditching, wells, etc., he is not entitled to compensation. See 12 An. 545; 16 An. 243; 24 An. 253; 26 An. 588; 99 U. S. 513."

Heirs of Wood v. Nicholls, 33 La. Ann. 750, 751.

Other decisions supporting or affirming the different rulings so made are to be found in Donaldson v. Hull, 7 Mart. (N. S.) 112; Lowry, Curator, v. Erwin, 6 Rob. 193, 39 Am. Dec. 556; Williams v. Booker et al., 12 Rob. 256; Walling's Heirs v. Morefield, 33 La. Ann. 1174; Heirs v. Murdock, 41 La. Ann. 494, 6 South. 131; V. S. & P. R. R. Co. v. Elmore, 46 La. Ann. 1237, 15 South. 701; McDade v. Levee Board, 109 La. 636, 33 South, 628; Voiers v. Atkins, 113 La. 333 et seq., 36 South. 974; Fontelieu v. Fontelieu, 116 La. 889, 41 South. 120; Quaker Realty Co. v. Bradbury, 123 La. 20, 48 South. 570.

The excepting of improvements inseparable from the soil, from those for which the possessor in bad faith in entitled to compensation, is no doubt a reasonable interpretation of C. C. 508, as applied to ditches and ordinary wells, since that article deals with the obligation of the owner to compensate the possessor, whether in good or bad faith, who has furnished material and applied labor thereto for the construction of an improvement upon premises from which the owner evicts him. The digging of a ditch, or an ordinary well involves, not the furnishing of material and applying labor thereto, thus

adding something to the owner's estate, but merely the excavation of the soil of the estate, in disregard, perhaps, of the interest and the wishes of the owner. An oil or gas well, producing those minerals in paying quantities, is another and quite a different affair, and, particularly where, as in this case, the owner's complaint is that the defendant did not drill or begin a well within 30 days after each preceding well was completed. Beyond that, to the hole in the ground, in each case, there is added, to complete a well, the piping—material furnished by the possessor—and to that is added the labor required to put the piping in position, and other material to hold it where put. Moreover, the piping, unlike a ditch, can be removed and used elsewhere. So that the wells 2 and 3 seem to be fairly within the meaning of C. C. 508; and, since plaintiff, though it does not specifically ask that they be decreed its property, prays that it be awarded their entire product, or the proceeds thereof, we take that prayer to mean an election to keep the wells, and we are of opinion that such election entitles the gas company to claim compensation as provided by article 508, and to use that claim by way of set-off pro tanto against the claim of plaintiff for fruits and revenues. The cost of two wells was $5,520.10, and a further sum of $482.22 was expended in "blowing out" the three wells, or, say, $321.48 for wells 2 and 3, making a total expenditure for those wells of $5,841.58. The output of gas, from the three wells, was 501,253,000 cubic feet, of which it is estimated that two-thirds was produced by wells 2 and 3, and the total price realized from the sale of the output, at 2 cents per 1,000 cubic feet, was $10,025.60, of which two-thirds or $6,837.73, is attributed to those wells. The offsetting, therefore, between the claim of the plaintiff, for revenues, and the claim of the defendants (or of the gas company), for the cost of wells 2 and 3,

shows a balance in favor of plaintiff of, say, $995.15.

Plaintiff, though claiming the forfeiture of its lease to the oil company, admits that the completion of well No. 1 entitles that company and its transferee to operate the well and to occupy, for that purpose, the five adjacent and surrounding acres of land; and the oil company, though denying that it acquired any right or incurred any obligation under the lease from plaintiff, asserts, through the brief of counsel, that, should the court reach a different conclusion, there should be judgment, as to well No. 1, in accordance with plaintiff's admission. The gas company, through the brief of its counsel, "earnestly, asserts" that the lease from the Nabors Company "should not enter into the discussion at all," that—

"Both defendant and warrantor have repudiated that lease, and that the case must stand or fall on the question, to whom did the minerals belong. If the contention is sustained that Nabors lost them by ten years' nonuser, then the defendant has nothing to complain of, for it has the Moseley lease. But if the minerals were not lost by ten years' nonuser, then the minerals, and all of them, belong to Nabors, and the judgment appealed from is correct."

Our conclusion, as to the situation thus presented, is that the oil company, as the warrantor of the title to well No. 1, conveyed by it to the gas company, has the right to insist upon the acceptance of the admission of the plaintiff that the title so conveyed is valid and should be sustained, and, as such admission and acceptance appear to us to inure to the benefit of both defendants, the judgment of this court will be in accordance therewith, though we express no opinion upon the question whether, upon the facts and law as found by the court, a different conclusion might not, otherwise, have been reached.

We find no objection to the allowance, by the trial court, of $600 by way of rental for

well No. 1, and, though it is not clear to us how these figures were arrived at, we assume that they are satisfactory to the litigants.

[6] The rights of the gas company against its warrantor, the oil company, are determined by the Civil Code, as follows:

"Art. 2506. When there is a promise of warranty, or when no stipulation was made on that subject, if the buyer be evicted, he has the right to claim against the seller:
"(1) The restitution of the price.
"(2) That of the fruits or revenues, when he is obliged to return them to the owner who evicts him.
"(3) All the costs occasioned, either by the suit in warranty on the part of the buyer, or by that brought by the original plaintiff.
"(4) The damages, when he has suffered any, besides the price that he has paid."

The price in this instance was $7,000, for which the oil company declared that—

It "sold, transferred and delivered, * * * with full and general warranty of title and with complete transfer and subrogation to all rights and actions of warranty against the property herein conveyed, unto the Southwestern Gas & Electric Company, * * * the following described property situated in the parish of De Soto, * * * to wit: Those certain oil and gas leases held by it and executed by the widow and heirs of Hill Moseley on the 24th day of July, 1914, as well as any and all other oil and gas leases which it now has of record, or in which it is interested, covering the east half of the southwest quarter of section 9, township 12, range 12, less the west half of the west half of the east half of the southwest quarter of said section; said lease covering 60 acres, more or less, and including the well now located thereon; reserving, however, free from this sale, the standard rig and all extra pipe and machinery on the premises, not necessary in the operation of said well now located thereon. To have and to hold said described property unto the said purchaser, its heirs and assigns forever. This sale and transfer is made and accepted for the consideration of $7,000.00, cash, the receipt whereof is hereby acknowledged.

"And for the same consideration, and as part of this transfer, the said vendor hereby gives and grants to the said vendee or its assigns, the right to purchase their lease on the N. ½ of N. W. ¼ of section 27," etc.

There has been no eviction, in so far as the well thus specially mentioned is concerned, and which we take to be the well No. 1 heretofore referred to; nor, so far as we are informed, has there been any failure on the part of the oil company to comply with the option agreement; nor have we any information as to the value of either the well or the option. It is therefore impossible in this suit to determine what proportion of the price paid by the gas company should be reimbursed. It has been compelled to turn over to plaintiff $995.15 of the "revenue" received from wells 2 and 3 and to utilize its claim against plaintiff for $5,841.58, by offsetting therewith plaintiff's claim for a like amount of revenue, and its warrantor therefore is liable to it, on account of the two wells, in the total sum of $6,836.73, with interest and all costs; no other loss or damage having been proved.

We have considered the argument on behalf of the warrantor and find nothing to convince us that it should be allowed to escape the discharge of its obligation and leave the warrantee to bear the losses against which it was warranted.

The judgment of the district court was, in the main, correct; but it needs amendments to effect which it will be more convenient to recast it.

It is therefore ordered that the judgment appealed from be amended and recast so as to read as follows:

It is adjudged and decreed that the Nabors Oil & Gas Company, plaintiff herein, have judgment against the Louisiana Oil Refining Company and the Southwestern Gas & Electric Company, defendants, annulling the contract of May, 10, 1914, between it and the defendant first named, and decreeing said plaintiff to be the sole owner of all minerals susceptible of ownership while not reduced to actual possession, and to be vested with the exclusive right to explore for, mine,

reduce to possession, and appropriate all minerals underlying, or that may underlie, the E. ½ of S. W. ¼ of section 9; township 12 N., range 12 W., in the parish of De Soto, save and except such as may underlie the five acres of land adjacent to and immediately surrounding the well known as "Nabors No. 1" or "Moseley No. 1," of which well and land the defendant Southwestern Gas & Electric Company is decreed, as between it and plaintiff, to be entitled to possession and enjoyment, as assign of said contract of May 6, 1914, otherwise annulled, and subject to the conditions thereof, with the option, however, to said defendant to accept or reject said well, whether for the purposes of settlement with plaintiff or with its codefendant, within 30 days from the date upon which this judgment shall become final.

It is further ordered that plaintiff have judgment against defendants, in solido, in the sum of $600, as rentals, at the rate of $200 per annum, for said well No. 1, with interest thereon at the rate of 5 per cent. per annum from November 28, 1916, until paid.

It is further ordered that plaintiff be decreed the owner and sent into possession of the wells known as Moseley Nos. 2 and 3, respectively, now existing and, perhaps, being operated on the tract of land in question, and together, also, with the proceeds of all together with all the piping and other appurtenances thereto attached or belonging, gas produced therefrom since said wells were taken into his possession by the sheriff.

It is further decreed that plaintiff have judgment against the defendants, in solido, in the sum of $995.15, balance of revenue received by the Southwestern Gas & Electric Company from the sale of gas produced from the wells 2 and 3, prior to the sequestration of said wells, with legal interest thereon from judicial demand until paid; and that said Southwestern Gas & Electric Company have judgment over against its codefendant and warrantor for said amount, or such part thereof as it may be compelled to pay to plaintiff. It is further ordered that said Southwestern Gas & Electric Company have judgment against its said codefendant and warrantor in the further sum of $5,841.58, with legal interest from judicial demand, in reimbursement of claim for that amount utilized in offsetting claim of plaintiff for which said warrantor was liable.

It is further ordered that the claim of said Southwestern Gas & Electric Company against said warrantor for $7,000, in reimbursement of price paid for property from which it is evicted by this judgment, be dismissed as in case of nonsuit.

It is further ordered and decreed that the defendant the Louisiana Oil Refining Company pay all the costs of this suit.

PROVOSTY and DAWKINS, JJ., concur in the decree.

O'NIELL, J. (dissenting in part). I do not concur in the opinion of the Chief Justice that prescription liberandi causa can be waived by agreement between the obligor and obligee. In other words, I do not concur in the opinion that the expression, in the contract in question, that the real right to explore for oil and gas was to be enjoyed or exercised "at all times" or "at any time hereafter," had the effect of preventing the running of the prescription of ten years by which servitudes or real rights are lost.

Article 3549 of the Civil Code declares, in terms, that the prescription liberandi causa runs against or notwithstanding the obligors' voluntary act. If it were not so, a promissory note might validly contain a stipulation that the debt should never prescribe.

Prescription liberandi causa may be interrupted, and, when it is, the prescription starts anew from the date of interruption. In this case the prescription was interrupted by the acknowledgment in the act of sale

made by Sample to Hill Moseley, on April 5, 1905; and the ten years' prescription began anew on that date. The fact that drilling operations were commenced within ten years from that date is the controlling fact in this case. For that reason alone the mineral rights acquired by the plaintiff herein by mesne conveyances from Sample were not lost by prescription. To that extent, I concur in the opinion of the Chief Justice; and I am of the opinion that it was and is unnecessary to go further into the question of prescription.

Inasmuch as the defendant gas company is not dispossessed or deprived of the well No. 1 and the five acres surrounding it, defendant is not entitled to any judgment against the oil company as a warrantor, for the cost or value of the well.

As to wells No. 2 and No. 3, plaintiff has elected to keep them, and therefore owes the defendant gas company compensation for the cost or value of those two wells. The oil company, however, as warrantor, does not owe compensation for those two wells. It appears that the defendant gas company did not ask for compensation from the plaintiff herein for wells No. 2 and No. 3; but that is no reason why the defendant gas company should have compensation from the warrantor. I doubt that there is any compensation due the defendant gas company for those two wells, because it appears from the record that the gas company has collected more for gas sold from those wells than the two wells cost. But, if there is compensation due for those two wells, it is due by plaintiff, not by the warrantor, oil company.

I do not concur in the opinion of the Chief Justice that the mineral lease which plaintiff seeks to annul is governed by the rules pertaining to an ordinary lease of a house or farm. Nor do I agree that it was inconsistent for the defendants to obtain a lease from a subsequent owner of the land, Hill Moseley, when defendants believed that the rights of the original lessor had been lost by prescription and had inured to the benefit of Hill Moseley, the owner of the land itself.

### On Rehearing.

O'NIELL, J. The main issue in this case has been disposed of by the opinion and decree rendered on the 17th day of this month in the case of the Frost-Johnson Lumber Company v. Heirs of Lottie A. and Ernest N. Salling (No. 22,916) 91 South. 207,[1] on the final hearing of the case. It was decided that mineral oil and gas at large beneath the surface of the earth were not subject to private ownership, as physical or corporeal property, separate and apart from the land. It was held that a contract by which the owner of the land had undertaken to sell the oil and gas supposed to be under his land, or had sold the land and attempted to reserve to himself the ownership of the oil and gas supposed to be under the surface, did not convey or reserve the ownership of the oil or gas itself, as physical or corporeal property, but conveyed or reserved only a real right, or servitude, to explore for oil and gas and to become the owner of whatever oil or gas might be discovered and reduced to possession. Hence it was held that the right so conveyed or reserved, being a servitude upon the land, was subject to the prescription liberandi causa, by which servitudes are forfeited or extinguished if not exercised during a period of ten years.

[7, 8] Under the doctrine announced in the case cited, the mineral rights acquired by the plaintiff in this case, through mesne conveyances from S. G. Sample, were lost by prescription, unless the prescription was interrupted in favor of plaintiff by the reservation made by Sample in his sale of the land to Hill Moseley. The sale by Sample to the author in title of the plaintiff in this suit was made on the 15th of February, 1904.

[1] 150 La. 756.

The oil and gas lease made by plaintiff to the defendant Louisiana Oil Refining Company was made on the 6th of May, 1914; that is, after the expiration of ten years from the time when plaintiff's author in title had acquired the mineral rights from S. G. Sample. In the meantime, no attempt had been made by the plaintiff corporation or its authors in title to exercise any right upon the land; which, on the 15th of April, 1905, was sold by Sample to Hill Moseley. The Louisiana Oil Refining Company, being advised that the mineral rights claimed by plaintiff had been forfeited or lost by prescription before the lease was made, obtained an oil and gas lease from the widow and heirs of the deceased Hill Moseley, on the 24th of July, 1914. In the meantime, but after the expiration of ten years from the time when plaintiff's author in title had acquired the mineral rights from S. G. Sample, the Louisiana Oil Refining Company had drilled a well that produced gas in paying quantities. On the 20th of February, 1915, the Louisiana Oil Refining Company transferred to the Southwestern Gas & Electric Company, codefendant herein, the lease that had been acquired from the widow and heirs of Hill Moseley, "as well as any and all other oil and gas leases" which the transferror had of record on the land, or in which the transferror had an interest.

The reservation of the mineral rights, in the deed made by S. G. Sample to Hill Moseley, was not an acknowledgment or recognition on the part of Moseley that the mineral rights had already been sold to the author in title of the plaintiff in this suit. The reservation was in this language, viz.:

"Saving and excepting and reserving unto the said vendor, his heirs and assigns, all oil and gas and other valuable minerals that may be under the surface of said land," etc.

The language of the reservation, in favor of the seller of the land, and his heirs and assigns, is too plain to admit of the construction that it was intended to inure to the benefit of plaintiff's author in title, to whom the mineral rights had already been sold. Even though it might have been so intended by S. G. Sample, it was not so acknowledged or recognized by Hill Moseley. In that respect, this case must be distinguished from the case of Frost-Johnson Lumber Co. v. Nabors Oil & Gas Co., 149 La. 100, 88 South. 723; where the purchaser of the land expressly acknowledged that the mineral rights had already been sold to the Louisiana Coal & Lumber Company; and where, for that reason, it was held that the prescription liberandi causa was interrupted, and that the ten years commenced anew from the date of the interruption.

Of course, the reservation made by S. G. Sample, in his sale of the land to Hill Moseley, could not have prejudiced the mineral rights which plaintiff's author in title had already acquired from Sample. If those rights had been exercised within ten years from the date when they were acquired by plaintiff's author in title from S. G. Sample, the reservation which he afterwards made, in his sale of the land to Hill Moseley, would not have availed him. But the reservation made by Sample in his sale to Moseley did not prolong the period of prescription which was running against the rights which Sample had already conveyed to plaintiff's author in title. When those rights were lost by prescription, the reservation which Sample had made in his own favor, and in favor of his heirs and assigns, was yet in effect. That reservation has not been asserted and is not in contest in this case.

[9] The expressions in the opinion originally handed down in this case, to the effect that the stipulations in the contract of sale of the mineral rights, by S. G. Sample to plaintiff's author in title, that the rights conveyed were to be exercised "at all times," or "at any time," made the rights imprescriptible, was not concurred in by a majori-

ty of the members of this court, as then constituted. Such a doctrine would be in direct conflict with the rule that an obligor cannot be bound by an agreement that his obligation shall not be extinguished by prescription liberandi causa. The period of prescription may be interrupted by a written acknowledgment on the part of the obligor; but, when so interrupted, it begins anew from the date of the acknowledgment. There are several pertinent articles of the Civil Code on that subject.

Article 3459 declares:

"The prescription by which debts are released, is a peremptory and perpetual bar to every species of action, real or personal, when the creditor has been silent for a certain time without urging his claim."

The word "creditor," in the article quoted, is synonymous with the word "obligee," as defined in article 3556, No. 20, viz.:

"Obligee or creditor is the person in favor of whom some obligation is contracted, whether such obligation be to pay a sum of money, or to do or not to do something."

Article 3460, referring to prescription liberandi causa, declares:

"One cannot renounce a prescription not yet acquired, but it is lawful to renounce prescription when once acquired."

Article 3549 declares:

"In cases of prescription releasing debts, one may prescribe against a title created by himself; that is, against an obligation which he has contracted."

From the provisions quoted from the Code, it is obvious that S. G. Sample, in his sale of the mineral rights to plaintiff's author in title could not have bound himself—much less the subsequent owners of the land—by an agreement on his part that the real obligation or servitude which was then imposed upon his land should not be subject to the prescription liberandi causa.

[10] A majority of the members of this court did not concur in the expressions in the opinion originally handed down in this case, to the effect that the Louisiana Oil Refining Company after acquiring the oil and gas lease from plaintiff, could not acquire an oil and gas lease from the widow and heirs of Hill Moseley, as owners of the land, when the lessee was informed that plaintiff had lost its oil and gas rights by prescription before the original lease was acquired. In that respect, the doctrine that an ordinary lessee, as of a house or farm, cannot dispute the title of his lessor during the term of the lease, has no application to a contract by which a person acquires mineral rights, in the form or name of a contract of lease. Such a contract, in that respect, is more like a sale than an ordinary lease. Surely a purchaser of mineral rights, on discovering that the seller had no title, is at liberty to buy the mineral rights from the one who has the title.

Inasmuch as the issues which are now decided were not so decided in the original judgment rendered by this court, and especially as only three members of the court who took part in the original decision of the case are taking part in this decision, we have concluded that, under section 4 of our Rule 14 (67 South. xi [1]), the right should be reserved to plaintiff to apply for a rehearing.

The judgment appealed from is annulled, and plaintiff's demands are rejected, and its suit is dismissed at its cost, reserving to plaintiff the right to apply for a rehearing within the delay days which the law allows.

PROVOSTY, C. J., and LAND and BAKER, JJ., dissent.

MONROE, C. J., had retired when the foregoing opinion was agreed on, and took no part therein.

---

[1] 136 La. xii.